### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 12-22275-CIV-SEITZ

**MAURY ROSENBERG**,

      Plaintiff,

v.

**DVI RECEIVABLES, XIV, LLC**, *et al.*,

      Defendants.

_____/

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' AMENDED RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW

THIS MATTER came before the Court on Defendants' Amended Rule 50(b) Motion for Judgment as a Matter of Law ("Motion") [ECF No. 260].  A jury found Defendants filed an involuntary bankruptcy petition against Plaintiff Maury Rosenberg ("Rosenberg") in bad faith and awarded compensatory and punitive damages totaling $6,120,000.00.  Defendants claim the jury lacked a legally sufficient evidentiary basis to (1) find bad faith; (2) award punitive damages; and (3) award compensatory damages for loss of wages and reputation.  Upon review of the Motion, Plaintiff's Memorandum in Response . . . ("Response") [ECF No. 265], Defendants' Reply . . . ("Reply") [ECF No. 271], and the trial record, the evidence could support the jury's verdict as to liability, but does not support the verdicts for punitive damages, lost wages and reputational harm.  Thus, while the verdict as to liability will stand, the awards for punitive damages and compensatory damages for lost wages and reputational harm cannot, and an amended judgment shall be entered.

## I.      INTRODUCTION

Section 303(i) of the Bankruptcy Code enables an alleged debtor to recover damages, including punitive damages, if it is shown that his creditors filed an involuntary bankruptcy petition against him in bad faith.  11 U.S.C. § 303(i).  In November 2008, Defendants petitioned to have Plaintiff, individually, National Medical Imaging, Inc. ("NMI"), the company he founded and managed, and NMI Holdings, a related company, put into involuntary bankruptcy.  The bankruptcy court dismissed the involuntary petition on August 21, 2009.

Plaintiff then sued the petitioning creditors in an adversary proceeding in bankruptcy court under 11 U.S.C. section 303(i), alleging Defendants filed the bankruptcy against him in bad faith.  Defendants invoked their right to trial by jury, and the Court removed the reference from the bankruptcy court to conduct the jury trial.  (*See* August 10, 2012 Order [ECF No. 9]).  The eleven-day trial was bifurcated into liability and damages phases.  At the end of the first phase of the trial, the jury found Defendants acted in bad faith when they filed the involuntary bankruptcy petition against Rosenberg; after phase two, it awarded Rosenberg compensatory damages in the amounts of $360,000 for emotional distress, $310,000 for loss of reputation, and $450,000 in lost wages; and it awarded $5,000,000 in punitive damages.  (*See* Jury Verdicts [ECF Nos. 191 & 198]).

Defendants seek to have the liability and damages verdicts set aside for legal error, claiming: (i) the jury could not have found bad faith in light of Defendants' reliance on counsel; (ii) the evidence does not support punitive damages; and (iii) the evidence does not support the jury awards for lost wages and reputational harm.  The Rule 50(b) Motion is denied as to liability because the record evidence could support the jury's finding of bad faith even in light of Defendants' advice of counsel defense.  Nevertheless, as to punitive damages, the Motion is

granted, as the record does not support that Defendants' conduct was malicious or egregious. The compensatory damages for lost wages and injury to reputation are also set aside because the evidence does not establish the involuntary bankruptcy proximately caused Plaintiff to lose wages or injure his reputation.

## II.      STANDARD

A court may enter judgment as a matter of law on an issue if a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  FED. R. CIV. P. 50(a).  In other words, judgment as a matter of law should be granted when a plaintiff has failed to present sufficient evidence to prove an element of the claim.  *Collado v. United Parcel Serv. Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005).  In adjudicating a motion for judgment as a matter of law, "the court should review all of the evidence in the record," but in doing so, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## III.     ANALYSIS

### a.      *Legally Sufficient Evidence Supports the Bad Faith Verdict*

Defendants assert because the uncontroverted facts adduced at trial supported an advice of counsel defense, the Court must set aside the jury's verdict on liability as a matter of law.  The liability case was a close call.  Plaintiff's case relied heavily on the emotional dimension of the facts. His testimony was emotionally charged and at times inflammatory; indeed, Defendants correctly pointed out more than once at trial that Rosenberg's testimony crossed the boundary from permissible testimony to unfair prejudice.  The jury did not issue a special verdict, so the basis of the bad faith finding is unknown.  However, because the record evidence *could* support

that Defendants acted with an improper purpose — the type of bad faith where an advice of counsel defense cannot shield a petitioning creditor from liability — the jury verdict must stand.[1]

Reliance on advice of counsel will not shield a petitioning creditor from liability for all bad faith involuntary bankruptcy claims.  Rather, whether the defense is available depends on which of two categories the bad faith falls into: "improper use" or "improper purpose."  *In re Better Care, Ltd.*, 97 B.R. 405, 412-13 (Bankr. N.D. Ill. 1989); *see also Gen. Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1493 (11th Cir. 1997) (citing *In re Better Care, Ltd.*, and distinguishing improper use from improper purpose).  "Improper use" bad faith occurs where the defendant improperly uses the bankruptcy system as a means to obtain an ultimately legitimate result; for example, filing an involuntary petition against a debtor as a means to collect a debt as opposed to using routine debt collection methods.  In this circumstance, "[w]here the attorney advises the client that this purpose should be effected by an involuntary bankruptcy, it is the attorney who is responsible for the improper use, not the client."  *In re Better Care, Ltd.*, 97 B.R. at 412 (alteration added).  In contrast, where the purpose for filing the bankruptcy in the

---

[1] The Court instructed the jury as follows:

> Defendants' first defense is that they relied on the advice of their counsel that the bankruptcy filing was lawful and proper in deciding to file the involuntary petition against Plaintiff . . . .

> In considering this defense, the issues for you to decide are whether the Defendants, before filing the involuntary bankruptcy petition:

> (1) in good faith, sought the advice of a lawyer;
> (2) gave that lawyer a full and fair statement of the facts known to the Defendants; and
> (3) relied on the lawyer's advice in filing the involuntary bankruptcy petition.

> In deciding whether the Defendants filed the involuntary petition in good faith or bad faith, you may consider whether they acted in reliance on advice of counsel.  However, if you find that the filing of the involuntary petition was motivated by ill will or malice, the Defendant's reliance upon the advice of their counsel will not preclude you from finding bad faith on the part of the Defendants.

(Court's Instructions to the Jury ("Instructions"), 4 [ECF No. 183]).

first place is improper, the defense does not apply and the client is not shielded from liability because "the client will usually come into the attorney's office with that purpose already formed. It is the purpose which constitutes bad faith in such a case and it is the client who is responsible for the purpose." *Id.*

As stated, because the jury did not return a special verdict about the exact nature of the bad faith, it is not possible to glean its rationale in reaching its decision.  Nonetheless, Plaintiff asserts the evidence supports two improper purposes which, if established, cannot be excused by reliance on counsel.  First, Plaintiff claims Defendants put him in involuntary bankruptcy as a strategic tool to "remove Plaintiff as NMI's control person."  (Resp. 19 (emphasis deleted)).  Second, Plaintiff claims Defendants filed the involuntary bankruptcy to "coerce and apply pressure on Plaintiff, individually, in order [to] extract the best settlement possible of NMI's obligations, including by using resources that Defendants could not otherwise attack, namely [Plaintiff's son's] Trust."  (*Id.* 23 (alterations added)).  Each position is discussed, but first it is necessary to address how Rule 50(b) is analyzed within the context of an affirmative defense.

Because Defendants have moved for judgment notwithstanding the verdict on their advice of counsel affirmative defense, they can only prevail if the jury *could not* have concluded Defendants had an improper purpose in filing the involuntary bankruptcy.  *See Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3rd Cir. 1976).  Moreover, Defendants must demonstrate the evidence supporting the advice of counsel defense was so overwhelming it would be the only rational conclusion the jury could have reached.  *Id.*  This means the evidence proving the defense must be of a nature that the jury "is not at liberty to disbelieve [it]."  *Id.* (alteration added; internal quotation marks and citation omitted).  When all inferences are drawn

in Plaintiff's favor, as is required by Rule 50(b), the record evidence does not support such a conclusion.

The three people primarily involved in Defendants' filing of the involuntary petition — Jane Fox ("Fox"), Robert Brier ("Brier"), and Robert Pinel ("Pinel") — all testified.   The evidence does not so overwhelmingly support the conclusion that Defendants had a proper purpose in filing the involuntary bankruptcy against Plaintiff so as to exclude the jury finding Defendants *could* have pursued a bankruptcy against Rosenberg for either or both of Plaintiff's stated reasons.  As discussed below, while this was a close case, Rosenberg presented sufficient evidence from which the jury could have reasonably concluded Defendants, with an interest in recovering money from him, retained an attorney for the purpose of filing an involuntary bankruptcy against Rosenberg to do so.

### i.      <u>Reason 1 – Defendants Sought to Remove Rosenberg from NMI</u>

Fox, a vice president in the equipment leasing division of Defendant U.S. Bank, was the decision-maker who caused Defendants to file the involuntary bankruptcies against NMI and NMI Holdings, and against Maury Rosenberg individually.[2]  (*See* Tr. 2/19/2013, 161 [ECF No. 249]).  If Fox determined she would file the involuntary petition against Rosenberg in order to remove him from NMI, such purpose is improper.  *See In re Better Care, Ltd.*, 97 B.R. at 410.  Cumulatively, the record evidence could support that Defendants sought to put Rosenberg into involuntary bankruptcy in order to remove him from NMI.

Brier, the consultant retained by Fox to be Defendants' point person in handling the NMI matter, explained one of the reasons he advised Fox to file an involuntary bankruptcy was that Rosenberg, as NMI's control person, was dissipating NMI's assets and bankruptcy provided a

---

[2] Fox testified since 1981 she worked for Defendant Lyon Financial.  Lyon is a loan servicer that managed the DVI entities' lease portfolios.  A bankruptcy court appointed Lyon DVI's servicer during DVI's own bankruptcy in 2003.  Sometime thereafter, Defendant U.S. Bank acquired Lyon Financial.

good means to prevent other creditors from preferentially receiving payments.  (*See* Tr. 2/20/2013, 190-91 [ECF No. 250]).  Defendants have not offered any authority to support the proposition that filing an individual bankruptcy against a corporate principal the creditor suspects will preferentially distribute corporate assets is a legitimate use of the bankruptcy system.  To the extent Defendants were concerned with the dissipation of NMI assets, their witnesses never explained to the jury how putting Rosenberg personally through an involuntary bankruptcy would safeguard NMI's assets, much less explain why they filed a Chapter 7 liquidation bankruptcy, as opposed to a reorganization bankruptcy.

Fox authorized Brier to hire counsel to assist him in handling the legal aspects of the NMI matter.  (*See* Tr. 2/19/2013, 197).  Pinel, the bankruptcy lawyer who worked on that case, including preparing the involuntary petition, explained at length that Defendants' main interest in filing involuntary bankruptcies against NMI and Rosenberg was to bring NMI under the custodianship of a bankruptcy trustee so the trustee could assume control of NMI and scrutinize NMI's assets and Rosenberg's personal finances.  (*See* Tr. 2/25/2013, 169-170 [ECF No. 235]).  Yet, that ostensibly legitimate purpose is belied by the fact that Defendants never sought the appointment of a trustee.  (*See* Tr. 2/25/2013, 80; Tr. 2/20/2013, 39; Tr. 2/26/2013, 23 [ECF No. 236]).[3]  Nor did any witnesses testify they had a specific reason to believe Rosenberg was directly syphoning NMI assets.[4]

On balance, given Brier's testimony about Rosenberg's control of NMI, Defendants' failure to seek the appointment of a trustee, and Defendants' failure to explain why removing

---

[3] Pinel explained Defendants chose not to seek the appointment of an interim trustee because "it would not have made sense" given Rosenberg filed a motion to dismiss in response to the petition.  (*See* Tr. 2/26/2013, 23).  It is unclear why the petitioning creditors did not seek the appointment of a trustee at the time they filed the petition for involuntary bankruptcy, although it could be due simply to poor lawyering.

[4] Brier testified that in 2006 there was a transfer from NMI of nearly $2.9 million to the Douglas Rosenberg Trust, not to Rosenberg directly.  (*See* Tr. 2/20/2013, 133).

Rosenberg would be proper under the Bankruptcy Code, the evidence was not so overwhelming that a reasonable jury could only have concluded Defendants had a proper purpose in filing an involuntary personal bankruptcy against Rosenberg.

### ii.    Reason 2 – Defendants Sought to Create Leverage Over Rosenberg to Improve Their Settlement

The evidence could also support that Defendants put Rosenberg into involuntary bankruptcy as a means of pressuring him into settling the dispute Defendants had with NMI about a delinquent $24 million loan the DVI Defendants made to NMI in 2002 for the purchase of MRI machines.  The DVI Defendants maintained a security interest in the machines as collateral.  The parties structured the deal so that NMI or an NMI entity would make lease payments to the DVI entity that financed the equipment purchase.  NMI did not make any payments under these financing agreements, and in 2005 certain of the DVI Defendants filed an involuntary bankruptcy against NMI, which the parties settled.  Defendants agreed to write-down the original $24 million dollar loan to $15 million, Rosenberg issued a personal guarantee of NMI's debts, and both NMI and Rosenberg also provided written confessions of judgment in the amounts of their respective obligations in consideration of the loan reduction.

Between 2006 and 2007, NMI paid on the restructured debt as required, but in February 2008, just two years into the ten-year payment plan, it stopped making payments.  As of that time, there was a $12.9 million dollar balance remaining on the loan.  Rosenberg's personal guarantee was $4.9 million.

Susan Verbonitz ("Verbonitz"), an attorney who represented Rosenberg and NMI, testified she made multiple settlement offers to Defendants in the spring and summer before the November 2008 involuntary filing.  (*See* Tr. 2/22/2013, 7 [ECF No. 252]).  On July 28, 2008, Verbonitz asked Defendants to further write-down the loan balance from $12.9 million to $5

million and reduce Rosenberg's personal guarantee from $4.9 million to $1.5 million.  (*See* Tr. 2/20/2013, 139).  Defendants believed the offer was "absurd" given the recent significant concessions.  (*Id.*).  Their counsel countered by restating a previous demand that NMI and Rosenberg pay $12 million because it "didn't make any sense to counteroffer at [those] levels [Verbonitz proposed]."  (*Id.* at 141).  Verbonitz further testified in her conversations with Robert Walton ("Walton"), another attorney Brier hired on Defendants' behalf, that Walton stated Rosenberg "can get the money."  (Tr. 2/22/2013, 42).

By July 2008, the parties had reached an impasse.  Defendants filed confessions of judgment in Bucks County, Pennsylvania on July 31, 2008.  (*See* Tr. 2/19/2013, 174).  Rosenberg's counsel filed a motion to reopen and strike the judgment on August 21, 2008, on the ground that Rosenberg disputed the validity and the amount of the judgment.  Upon receiving Rosenberg's motion, the court stayed the judgment's execution.  Sometime between October 28 and October 31, 2008, Defendants determined they would pursue an involuntary bankruptcy against the NMI entities and Rosenberg personally.  (*See id.* 188).  Contemporaneously with the involuntary filing, Brier emailed Defendants' counsel to inquire if they could find out how much money the Douglas Rosenberg Trust ("Trust") had.  (*See* Tr. 2/21/2013, 75-76).  Brier knew Rosenberg had zero assets and $17 million in personal guarantees.  (*See* Tr. 2/20/2013, 35).  Defendants further knew the Trust had paid Rosenberg's salary and was solvent enough to have loaned NMI millions of dollars over the years.

Defendants concede the evidence "may have been minimally sufficient for a reasonable [jury] to find 'improper use[,]'" meaning improper use of the bankruptcy system as an alternative to normal debt collection procedures.  (Mot. 21 (alterations added)).  When viewed in the light most favorable to Plaintiff, the evidence could suggest filing an involuntary bankruptcy against

Rosenberg personally was not merely ill-advised, but rather, a means for Defendants to exert leverage over Rosenberg to get him to pay NMI's debts.

By the time of the July 2008 repayment impasse, Defendants knew Rosenberg was uncollectable and NMI was in precarious financial shape based on Rosenberg's counsel's representations and because NMI had not paid Defendants since February 2008.  The jury could have reasonably concluded obtaining a judgment against Rosenberg personally by filing the confessions of judgment against him in August would have incentivized Rosenberg to come up with the money to settle NMI's debts, possibly by getting it from the Trust.  Defendants only decided to file the involuntary bankruptcy against Rosenberg after he opted to fight the confessions of judgment in Bucks County. [5]  Thus, the jury could have concluded pursuing the involuntary bankruptcy against Rosenberg personally was a strategic decision to improve Defendants' collection efforts on the NMI debt.

Additionally, the jury heard two other facts which, in conjunction with those set out above, may have supported Plaintiff's second theory.  First, Fox testified that U.S. Bank had previously put two other commonly-owned medical imaging companies into involuntary bankruptcies and thereafter those companies settled their disputes with U.S. Bank.  (*See* Tr. 2/25/2013, 82).  Second, Plaintiff was able to show a potential conflict of interest with respect to Defendants' professional advisors.  Brier, the consultant Fox made the point-person for handling the NMI matter, and Walton, the senior partner at the Flamm law firm that Defendants retained to provide legal advice, were both NMI creditors.  (*See* Tr. 2/19/2013, 216).  Brier and Walton

---

[5] Of course, the jury also received testimony that on October 6, 2008 Rosenberg advised Fox that NMI had closed its Maryland and Illinois locations and would surrender equipment at several Pennsylvania locations, and on November 3, 2008, Rosenberg wrote Brier to tell him all the centers would be closed by December 15, 2008.  These facts suggest Defendants had reasons for pursuing an involuntary bankruptcy when they did.  Nevertheless, because under Rule 50(b) the analysis focuses on whether the jury *could not* have found bad faith, the only relevant facts are those which would support a bad faith finding.

each owned a 50% share in an entity called Ashland Funding.  Ashland Funding was a portfolio company that owned equipment leases, including a lease of medical imaging equipment at an NMI center in Illinois.  Thus, it is colorable that Brier and Walton had an interest in maximizing the amount recouped from the NMI entities and Rosenberg.[6]  When considered with the evidence the jury heard regarding the negotiations, Rosenberg and NMI's financial status, and the timing of the involuntary petition's filing, these additional facts would allow the jury rationally to conclude Defendants filed the involuntary bankruptcy petition against Rosenberg for an improper purpose.

**b.    *The Punitive Damages Award Must Be Set Aside***

Although a finding of bad faith is a necessary first step before punitive damages can be considered, such finding by itself is not sufficient.  There must be additional evidence that Defendants acted with intentional malice or that Defendants' conduct was particularly egregious or reprehensible.  *See, e.g.*, *In re Schloss*, 262 B.R. 111, 116-17 (Bankr. M.D. Fla. 2000) (while an improper motive, i.e.  purpose, justifies a finding of bad faith, "unless there is a showing that it was done with malice, [a] punitive damages award is not appropriate") (alteration added)); *compare In re K.P. Enter.*, 135 B.R. 174, 184 (Bankr. D. Me. 1992) (declining to award punitive damages where creditor's "conduct, although misguided and recalcitrant, was not malicious or vengeful[,]" and so "the policy at work in § 303(i) would [not] be advanced by awarding punitive damages") (alterations added)) *with In re John Richards Homes Bldg. Co., L.L.C.*, 439 F.3d 248, 258-262 (6th Cir. 2006) (affirming punitive damages where, among other things, the

---

[6] The jury also heard from Rosenberg, who Defendants called during their case in chief on liability. Throughout his testimony, Rosenberg gave extended soliloquies about how "the Bank" — which Rosenberg equated to all of the Defendants — put him in an involuntary bankruptcy as a form of "blackmail."  He repeatedly analogized Defendants' conduct to "putting a gun to his head."  He also compared Defendants' actions to a thief coming into his house and snatching a necklace off his wife's neck.  Drawing all inferences in favor of Plaintiff, it must be assumed the jury credited this testimony.

petitioning creditor "outrageously threatened [the alleged debtor with] criminal prosecution," contacted other creditors, "used improper threats and flaunted his wealth" to cajole them into joining the involuntary filing, and even engaged a public relations firm to publicize that the alleged debtor had a bankruptcy filed against him).

The Court instructed the jury that punitive damages would only be warranted if the evidence showed Defendants acted with malice or that Defendants' conduct was particularly egregious.  The jury instruction defined malice as an intentional doing of a wrongful act without just cause or excuse and with the intent to cause harm to Plaintiff, and egregiousness as "extremely or remarkably bad."  (Instructions, 4).

The record is bereft of any maliciousness, intentional deception, or egregious conduct essential for the imposition of punitive damages.  As the United States Supreme Court has instructed, the degree of reprehensibility is the most critical of the factors for going beyond compensatory damages and imposing punishment.  In determining the degree of reprehensibility of a defendant's conduct in the context of punitive damages, the Supreme Court has instructed courts to consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.  The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (internal citations omitted).

Plaintiff's evidence does not satisfy this standard.  Instead of producing any evidence to establish the reprehensibility of Defendants' conduct or Defendants' malicious intent in filing the

12

involuntary bankruptcy, Rosenberg relied entirely on emotional pleas to the jury as a justification for punitive damages.  While that tactic might have inured to Plaintiff's favor in securing the high punitive damages award, without actual evidence to support it, at the Rule 50(b) stage the punitive damages must be set aside as a matter of law.

The evidence clearly demonstrated Plaintiff's financial difficulties were not limited to the involuntary petition.  Rosenberg repeatedly represented to Defendants, including under oath as recently as the month before the filing, that NMI was floundering financially and considering bankruptcy, and he had no personal assets on which to make good on his guarantee.  Defendants' business decision to file the involuntary bankruptcy against Rosenberg and his companies certainly reflected a legitimate concern.

In the lead up to the involuntary filing against Rosenberg, the parties negotiated to seek a resolution to NMI's recurring non-payment.  After Defendants filed the 2005 involuntary bankruptcy against NMI, they agreed to write-down the $24 million loan to $15 million — a substantial concession.  As part of that settlement, Plaintiff agreed to a confession of judgment should either NMI, or he, as NMI's guarantor, not pay.  When NMI stopped paying on that restructured balance in February 2008, Fox, as the loan servicer, became understandably concerned because the loan had only just been renegotiated and significantly written down.  Because she did not have the expertise to resolve the parties' dispute, she retained Brier as a consultant for the purpose of investigating how Defendants could best be paid the remaining balance.

The negotiations reached an impasse in July, without even token payments by NMI and with Plaintiff's insistence the debt and guarantee be further substantially reduced.  It was only then that Defendants invoked their right to file the confessions of judgment.  And even though

Defendants filed the confessions of judgment, Brier nonetheless made attempts to help Rosenberg arrange a *voluntary* sale of the NMI centers that had leased Defendants' equipment. (*See* Tr. 2/20/2013, 150).  Brier found interested parties and attempted to connect Rosenberg with them.

Brier testified that, as secured lenders, it was in Defendants' interest to have their securitized collateral used by a facility with patients and a revenue stream.  Nothing in the evidence suggests in the lead up to filing the involuntary bankruptcy, Defendants sought to destroy Rosenberg's business or injure him personally.  To the contrary, Defendants seemed to have understood their best chance of recovery would be to help NMI out of its financial difficulties, first by forgiving some of the debt, and second by trying to find a buyer for some of its centers.

With respect to the actual filing of the bankruptcy, Defendants retained counsel.  *See In re Apache Trading Grp., Inc.*, 229 B.R. 891, 894 (Bankr. S.D. Fla. 1999) ("Reliance on counsel . . . may be considered on the favorable side of the ledger in [a bad faith] consideration.") (alterations added)).  There was no evidence any lawyer advised Defendants filing an involuntary bankruptcy would be improper given the circumstances.  Defendants' counsel testified he did not lack any material information he needed and he prepared the petitions because he believed they were proper.  While counsel would not earn an "A+" grade for his preparation, the law does not demand perfection of lawyers, and Plaintiff's evidence of slip-ups was evidence of sloppiness rather than material errors which an amendment could not rectify.  Counsel used the DVI Defendants as the petitioning creditors based on his own research and because no issue had been raised as to their propriety as petitioning creditors in the 2005 case.  Furthermore, the second

ground for the dismissal of the involuntary bankruptcy was reversed on appeal, underscoring the fact reasonable minds could differ on these legal issues.

Finally, there is no evidence showing any of the actors involved in Defendants' decision to put Rosenberg into an involuntary bankruptcy — Fox, Brier, Walton, or Pinel — had any ill will toward Rosenberg, harbored any personal animus toward him, or sought to hurt him personally.  There was no evidence of any bad or malicious feelings toward Rosenberg, and there was no "smoking gun" communication exchanged between any of the key players that could lead the jury to believe the witnesses' true feelings to be different from their trial testimony.  Nor was there evidence of trickery or deceit on Defendants' part.  Furthermore, there was no evidence the two other involuntary petitions filed against the imaging companies were found to be improper. There is simply no pattern of bad acts.  On balance, a reasonable jury could only have concluded Defendants' actions, although improper, were motived not by malice but by a desire to obtain an advantage in a contentious financial dispute with an individual who has a prolific history of using litigation as a tool to enhance his own bargaining position.

Looking beyond the repetitious argument of "the 6th largest bank" "holding a gun to his head," the two facts Plaintiff relied on for punitive damages were the Brier/Walton conflict of interest and the fact the involuntary was filed against him personally.  As to the charge that Brier and Walton had a personal financial interest in the outcome of the case, neither one had the authority to file an involuntary petition on Defendants' behalf; only Fox did.  Moreover, even if Brier and Walton, as creditors, had an interest in putting Rosenberg into involuntary bankruptcy, it could not be said they directly caused Defendants to file the involuntary petition against Rosenberg.  While the conflict of interest speaks to Defendants' lack of judgment in obtaining professional advice, it cannot be said that but for Defendants' poor decision in selecting advisors,

Defendants would not have decided to put Rosenberg into bankruptcy.  Poor judgment is not intentional malice.

Plaintiff's second argument in support of punitive damages was that this case involved a run-of-the-mill business dispute — the non-payment of leases on commercial equipment — yet Defendants put an individual corporate officer into a personal bankruptcy.  This argument is not supported by the evidence.  Plaintiff, as an individual, structured his finances so that he was entwined with NMI, was a guarantor of its restructured debt with the DVI entities, and agreed to provide the confession of judgment.  *He* then elected to contest what he had previously agreed to. This was not a situation where Defendants sought to put an unrelated third-party — for instance Rosenberg's wife or son — into involuntary bankruptcy for the purpose of obtaining leverage over Rosenberg as NMI's decision-maker.  Had Defendants been *intentionally* dishonest in filing an involuntary petition against Rosenberg, such conduct would have warranted the imposition of punitive damages.  *See, e.g.*, *In re Meltzer*, --- B.R. ----, No. 13 B 31151, 2014 WL 4215434 (N.D. Ill. Aug. 27, 2014) (punitive damages awarded where, to forestall eviction proceedings, petitioning creditor put landlord into involuntary bankruptcy by creating phony company to serve as third petitioning creditor, invoked his Fifth Amendment rights when questioned about it, and threatened other vexatious litigation).

When viewed in the light most favorable to Plaintiff, the evidence is wholly lacking to support a finding of egregious or malicious conduct, such that the law would permit the imposition of punitive damages.  Accordingly, the punitive damages award is set aside as a matter of law.[7]

---

[7] Because the punitive damages award has been set aside as not supported by the record, it is unnecessary to reach the question of whether the amount of punitive damages exceeded constitutional limits.

    **c.**    *The Evidence Does Not Support Lost Wage or Reputational Harm Damages*

To give effect to section 303(i)(2)'s proximate cause requirement, the Court instructed the jury that to award compensatory damages, Plaintiff had to establish with "reasonable certainty" that the bad faith involuntary filing directly produced or substantially contributed to his injuries.  *See Royster Co. v. Union Carbide Corp.*, 737 F.2d 941, 948 (11th Cir. 1984). ("Proof must show with reasonable certainty that the plaintiff suffered damages and that the damages flowed as the natural and proximate result of defendant's wrongful conduct.") (internal citation omitted)).  Plaintiff failed to establish the requisite legal nexus between the involuntary petition and either his lost wages or his harmed reputation.  Thus, the awards for both types of damages is set aside.

    **i.**    **Lost Wages**

The $450,000 lost wages award is not supported by the evidence.[8]  Rosenberg offered two theories to support his entitlement to lost wages.  Under the first theory, Rosenberg claims the involuntary bankruptcy filed against NMI in November 2008 caused it to shut down in November or December of 2009, leaving him, as NMI's managing director, without an employer and consequently without a salary.  The argument is not well-taken, because it seeks to vindicate NMI's rights, not Plaintiff's.  Because that standing problem is fatal, Rosenberg is foreclosed from recovery based on that argument.  (*See* Oct. 19, 2012 Order, 2-5 [ECF No. 49]).

Plaintiff's second theory, while not foreclosed on standing grounds, is no more availing. Under this theory, Rosenberg contends because Defendants filed an involuntary bankruptcy

---

[8] Rosenberg testified he made either $200,000 or $225,000 a year and received a salary at this level in every year between 2005, when NMI settled the first involuntary bankruptcy, through 2009, the year Defendants' involuntary bankruptcy against Plaintiff individually was dismissed.  (*See* Tr. 2/28/2013, 76 [ECF No. 257]).  Plaintiff received his salary for 2008 and 2009.  In awarding $450,000 in lost wages, it appears the jury awarded Rosenberg two years' salary for what Plaintiff claims he would have earned in 2010 and 2011 at the rate of $225,000.  It is noteworthy that while NMI paid its employees, including Plaintiff, it was able to do so because of loans from the Trust.

against him, his other creditors called in their outstanding loan obligations under cross-default acceleration provisions triggered by the personal bankruptcy because he was a guarantor of those loans.  One creditor that exercised its rights under the cross-default provision was Sterling Bank, the bank that provided NMI's revolving credit facility.  Sometime after Sterling learned of the involuntary bankruptcy against Rosenberg, it accelerated its collection of NMI's receivables and turned off the credit line, leaving NMI without bank financing for its day-to-day operations.

The record does not support recovery under this second theory for two reasons.  First, the parties stipulated Rosenberg's testimony concerning the involuntary bankruptcy causing the cross-defaults could only be considered for recovery of emotional damages, if any.  (*See* Tr. 2/28/2013, 82-83).  When Plaintiff's counsel questioned Rosenberg about why Sterling invoked the cross-default provision, Defendants repeatedly objected on hearsay grounds.  (*See id.* at 75-78).  At a sidebar that followed, the parties' counsel stipulated such testimony would only be admissible for its effect on the listener as it pertained to Plaintiff's claimed emotional damages.  Eventually, Plaintiff testified he knew the bank invoked the cross-default provision because one of its representatives called to explain it had to because the case was still pending.  (*See id.* at 84).  A line of questions followed about "how [Plaintiff] felt about that."  (*Id.* at 85).  No Sterling Bank representative testified as to why the bank turned off NMI's credit line.  Thus, the only evidence the jury received on causation to support the cross-default theory was Rosenberg's testimony, which, given the stipulation, could not serve as evidence of lost wages.

Second, even if the testimony could be used for lost wages purposes, Rosenberg never established NMI would be a viable business in the future.  As such, Plaintiff did not show he was legally entitled to lost wages damages.  *See Alan's of Atlanta, Inc. v. Minolta Co.*, 903 F.2d 1414, 1426 (11th Cir. 1990) ("The fact of damage is made out upon proof that the plaintiff's

level of profits . . . is . . . less than it otherwise would have been absent some intervening cause."). To the contrary, Plaintiff admitted before Defendants filed the involuntary bankruptcy, the outpatient diagnostic industry was undergoing a severe downturn because of the implementation of the Deficit Reduction Act, which he explained slashed reimbursement rates for private centers like NMI. (*See* Tr. 2/28/2013, 60). This was justification for NMI's lack of profits, its inability to repay the loans and for closing many of its locations, and part of the reason for Plaintiff's desire for another reduction of his and NMI's debt.

Rosenberg testified he had a three-fold strategy to deal with these market difficulties. (*See id.* 57-62). First, the existing centers would expand their range of services to include other testing, including phlebotomy, and also start marketing more toward workman's compensation plans to mitigate against changes in the insurance reimbursement rates. Rosenberg did not provide any evidence, much less expert testimony or any detailed analysis beyond his own assertions, to support the viability of such a plan. Second, Rosenberg stated NMI would acquire a number of imaging centers in Florida that had liquidity problems. But Plaintiff brought forth no evidence of a loan commitment or other capitalization plan to support this purported expansion. Finally, Rosenberg claimed he was investigating buying a hospital in New Jersey. Here again, Rosenberg's proposal for NMI's new direction was unsupported by a financing or business plan, a valuation model, or any expert analysis.

On balance, Rosenberg's testimony about NMI's future profitability was entirely conjecture unsupported either by data or expert opinion. Plaintiff offered no tangible evidence showing NMI could pay him in the future, and thus even if Plaintiff could establish the involuntary bankruptcy caused NMI to fail, he did not establish the bankruptcy proximately caused him to lose wages. *See Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 922 (11th Cir. 1987)

("[D]amages for lost anticipated profits in commercial enterprises are considered speculative absent an established business and history of profits. . . . This principle disallows the assessment of damages where the court cannot tell how successful, if at all, the business practices relied on would be.") (alterations added; internal citations omitted)).

**ii.    Reputational Damages**

The jury awarded $310,000 for damages to Plaintiff's reputation.  The only testimony about Plaintiff's reputation came from Rosenberg himself; he claimed before the bankruptcy he was "everybody's friend."  (Tr. 2/28/2013, 85).  He stated after the involuntary bankruptcy lenders shunned him, his business credit "disappeared," he stopped receiving invitations to participate in charitable events, and he lost friends.  Under section 303(i), "proximate cause is the . . . negligent act that actively aids in producing the injury as a direct and existing cause." *George v. Brandychase Limited P'ship*, 841 F.2d 1094, 1096 (11th Cir. 1988).  Crediting both that his reputation was good and it suffered after bankruptcy, the reputational damage claim fails as a matter of law because Rosenberg has not established it was the bankruptcy that proximately caused the injuries to his reputation.

By definition, reputation is how *others* regard an individual; why one has lost esteem in the eyes of others usually requires an explanation from those people about why that esteem has been lost.  Plaintiff did not introduce any testimony from any independent non-family third-party that could attest the involuntary bankruptcy, as opposed to something else, caused that lack of esteem in the eyes of others.  *Cf. In re John Richards Homes Bldg. Co., L.L.C.*, 439 F.3d at 263 (affirming damage award as sufficiently supported as to proximate cause because plaintiff's colleague testified plaintiff's reputation suffered in the industry because of the bankruptcy and that several people had talked about plaintiff's bankruptcy at industry events).  Without an

explanation from the bankers who refused to lend him money, the organizations that allegedly did not continue to involve him in their activities, or the former friends who now disavowed him as to the reason or reasons why, the jury did not have evidence showing the involuntary bankruptcy proximately caused the harm.

Nor could the jury reasonably infer the bankruptcy caused the damage to Plaintiff's reputation.   Rosenberg testified that 2008 was "a very difficult time for banking."   (Tr. 2/28/2013, 84).   Although Plaintiff testified there were "five or six" real estate development opportunities he lost "as a result of the involuntary bankruptcy," it is not clear the involuntary, as opposed to industry-wide changes, caused Plaintiff to lose those opportunities.   (*See id.* at 100).   Similarly, Rosenberg cannot rely on an inference for proximate cause that the bankruptcy caused him to "lose friends" and not be invited to charity events.   There are many reasons why an individual might lose the affection of his friends or not be invited to events.   Moreover, the loss of friends and the loss of one's ability to participate in worthy causes is not, in and of itself, a reasonable and probable consequence of a bankruptcy filing such that a jury may infer the bankruptcy proximately caused Plaintiff's stated damages.   *See Imaging Bus. Mach., LLC v. BancTec, Inc.*, 459 F.3d 1186, 1190 (11th Cir. 2006) (defining proximate cause as "an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred." (quoting *Thetford v. City of Clanton*, 605 So. 2d 835, 840 (Ala. 1992))); *see also Peer v. Lewis*, - - F. App'x - -, 2009 WL 323104, at *2 (11th Cir. Feb. 10, 2009) ("On the merits, we conclude that the evidence at trial was 'legally insufficient' to allow a reasonable jury to find that Peer's filing of the lawsuit caused Lewis to lose the election or campaign contributions.   FED. R. CIV. P. 50(a).   As the record shows, Lewis failed to show that Peer's actions were the proximate cause of his losing the

election.").  Plaintiff could not rely on an inference in lieu of evidence to establish the proximate cause element of his reputational damages claim.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants' Amended Rule 50(b) Motion for Judgment as a Matter of Law [ECF No. 260] is **GRANTED IN PART AND DENIED IN PART**.  An amended judgment will be entered consistent with this Order.

**DONE AND ORDERED** in Chambers in Miami, Florida, this 29th day of September, 2014.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:  Honorable Patricia A. Seitz
    Honorable William C. Turnoff
    counsel of record